IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN AND EASTERN DIVISIONS

| | |
|---|---|
| ANTHONY T. LEE, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff-Intervenor | ) |
|     and Amicus Curiae, | ) |
| | ) |
| NATIONAL EDUCATION | ) |
| ASSOCIATION, INC., | ) |
| | ) |
|     Plaintiff-Intervenor, | ) |
| | ) Civil Action |
|     v. | ) Nos. |
| | ) |
| LEE COUNTY BOARD OF EDUCATION, | ) 3:70cv845-MHT |
| RUSSELL COUNTY BOARD OF EDUCATION, | ) 3:70cv848-MHT |
| TALLAPOOSA COUNTY BOARD OF EDUCATION, | ) 3:70cv849-MHT |
| ALEXANDER CITY BOARD OF EDUCATION, | ) 3:70cv850-MHT |
| AUBURN CITY BOARD OF EDUCATION, | ) 3:70cv851-MHT |
| OPELIKA CITY BOARD OF EDUCATION, | ) 3:70cv853-MHT |
| PHENIX CITY BOARD OF EDUCATION, | ) 3:70cv854-MHT |
| ROANOKE CITY BOARD OF EDUCATION, | ) 3:70cv855-MHT |
| BUTLER COUNTY BOARD OF EDUCATION, | ) 2:70cv3099-MHT |
| COVINGTON COUNTY BOARD OF EDUCATION, | ) 2:70cv3102-MHT |
| ELMORE COUNTY BOARD OF EDUCATION, | ) 2:70cv3103-MHT |
| CRENSHAW COUNTY BOARD OF EDUCATION, | ) 2:66cv2455-MHT |
| et al., | ) |
| | ) (WO) |
|     Defendants. | ) |

## OPINION ON THE STATE-WIDE
## ISSUE OF SPECIAL EDUCATION

In these longstanding school desegregation cases, there are two remaining issues that concern relief at the state level: 'special education' and 'facilities.' The defendants on the state-wide issues are the Alabama State Board of Education and its members, the Alabama State Superintendent of Education, and the Governor of Alabama as President ex officio of the State Board of Education. These state officials have moved for declaration of unitary status and termination of this litigation as to the issue of special education and the obligations undertaken in a 2000 consent decree. Based on the evidence presented, the court concludes that the motion should be granted and this litigation terminated as to the special-education claim against the state officials.

# I. BACKGROUND

## A. Early Litigation

These cases are part of litigation that began in 1963 when several black students and their parents sued the Macon County Board of Education and its superintendent seeking relief from the continued operation of a racially segregated school system.  On July 16, 1963, the United States was added as plaintiff-intervenor and amicus curiae in order that the public interest in the administration of justice would be represented.  Lee v. Macon County Bd. of Educ., 267 F.Supp. 458, 460 (M.D. Ala. 1967) (three-judge court) (per curiam).  After actions by the State of Alabama to prevent implementation of this order, the Macon County plaintiffs filed an amended and supplemental complaint on February 3, 1964, alleging that the state board of education and its members, the state superintendent, and the governor had asserted general control and supervision over all public schools in the State in order to maintain a de jure

3

segregated school system.  The court found that it was the policy of the State to promote and encourage a dual school system based on race, and the state officials were made defendants.  Lee v. Macon County Bd. of Educ., 231 F.Supp. 743 (M.D. Ala. 1964) (three-judge court) (per curiam).

In 1967, the court determined that the state officials had engaged in a wide range of activities in the day-to-day performance of their duties in the general supervision and operation of the public school system that were designed to maintain segregated public education throughout the state, including in the area of student assignment.  These activities interfered with the orderly desegregation of the public schools in the State of Alabama.  Lee v. Macon County Bd. of Educ., 267 F.Supp. at 478.  The court ordered the state officials to "take affirmative action to disestablish all state enforced or encouraged public school segregation and to eliminate the effects of past state enforced or state

encouraged racial discrimination in their activities and their operation of the public school systems throughout the State." Id. at 480.

In this and subsequent orders, the court ordered the state superintendent to require school districts throughout the State to desegregate their schools. Lee v. Macon County Bd. of Educ., 292 F.Supp. 363 (M.D. Ala. 1968) (three-judge court) (per curiam); Lee v. Macon County Bd. of Educ., 267 F.Supp. 458. On June 24, 1970, the three-judge court transferred the jurisdiction over 35 school boards involved in the litigation to a single district judge of the United States District Court for the Middle District of Alabama, where the school districts were located. The remaining local cases in the litigation were transferred to other federal district courts around the State. Other local school desegregation cases had also been filed throughout the State.

### B.  The 1997 Review

In 1997, this court undertook a review of the local school desegregation cases on its docket.  On February 12, 1997, the court entered an order affecting twelve school systems, stating that the court was "of the opinion that the parties should now move toward 'unitary status' ... and for the termination of the litigation [for the school systems] in these cases."

This set in motion a lengthy and deliberative process for reviewing each of the school systems.  The parties in all the cases agreed upon the format and scope of informal discovery.  The court designated a magistrate judge to oversee discovery and to mediate any disputes that arose during the course of negotiations.  The process in each of the cases involved lengthy informal discovery to obtain information about the school system, including touring the district's facilities and meeting with class and community members.  The plaintiff parties identified areas for which satisfactory compliance had been attained and those areas needing further attention.

A consent decree resolving the local issues was entered in each of the cases.[1]

An additional question arose, as part of the court's review of the local desegregation cases, whether the state officials remained parties in the local offshoots of the Macon County case. Over the course of years, as litigation affecting the individual local school districts was addressed separately, the state officials had not participated in the litigation. In 1997, the court concluded that the state officials should continue as defendants in the local cases as well as the state-wide litigation. Lee v. Lee County Bd. of Educ.,

---

1. Following a period of monitoring of the decrees' implementation, including annual status conferences, motions for declaration of unitary status and dismissal were filed in each of the twelve local cases. Fairness hearings were held in eleven of these cases, the motions were granted, and dismissal orders were entered. Each order held that the state defendants were not dismissed and the orders dealing with the state-wide special-education and facilities issues were not dissolved. See, e.g., Lee v. Butler County Bd. of Educ., 183 F.Supp.2d 1359, 1369 (M.D. Ala. 2002) (Thompson, J.). A fairness hearing on the twelfth case is scheduled later this year.

963 F.Supp. 1122, 1128-30 (M.D. Ala. 1997) (Thompson, J.).

The court noted the State's continuing obligations to address vestiges of segregation which may be linked to the prior dual system and to the State's role in having created and maintained a segregated system of public education. The court specifically found that the state officials had not yet met their burden under Green v. County Sch. Bd. of New Kent County, 391 U.S. 430 (1968), to show that school attendance, faculty, staff, transportation, extracurricular activities, and facilities were free from racial discrimination; that there had been full and satisfactory compliance with earlier orders; that retention of judicial control was not necessary or practical to achieve compliance with the court's orders; or that they had demonstrated to the public and to black parents and students their good-faith commitment to the whole of applicable orders. Lee v. Lee County Bd. of Educ., 963 F.Supp at 1130 (citing Freeman v. Pitts, 503 U.S. 467, 486 (1992)).

8

## C.   The 2000 Consent Decree

In 1998, as part of the review of the local school districts, the court directed the parties to report on the status of all state-wide issues.  Following a period of discovery and analysis, the parties advised the court that two state-wide issues remained: special education and facilities.   The issue of special education was raised because of the observation of disproportionality in the identification and classification of students in certain exceptionalities during discovery related to the twelve local school cases.  Black students appeared to be greatly overrepresented in the disability categories of mental retardation (MR) and, to a lesser extent, emotional disturbance (ED), but were underrepresented in the categories of specific learning disabilities (SLD) and in gifted programs.  The focus turned to the State because of its supervisory role in administering the laws and regulations related to the special-education process.

The state-wide issue involving special education was resolved, and a consent decree was approved in orders

9

entered in the twelve cases on August 30, 2000.  <u>Lee v.</u>
<u>Butler County Bd. of Educ.</u>, 2000 WL 33680483 (M.D. Ala.
2000) (Thompson, J.).[2]  The decree set forth in detail the
actions necessary for the State to attain unitary status
in the area of special education with a focus on
developing and implementing policies and procedures to
address the overrepresentation of black students in the
disability categories of MR and ED and their
underrepresentation in the disability category of SLD and
in gifted programs.  In approving the decree, so as to
ensure that the case would end without complications or
delays, the court also set annual status conferences to
address any problems that could arise.

The provisions of the 2000 decree required the State
to (1) revise the administrative code procedures and
policies related to the special-education process,

---

2.  The state-wide issue involving facilities was
resolved, and the consent decree was approved in orders
entered on April 20, 2006, in these twelve cases.  <u>Lee v.</u>
<u>Lee County Bd. of Educ.</u>, 2006 WL 1041994 (M.D. Ala. 2006)
(Thompson, J.).

including the pre-referral and referral stages and evaluation and eligibility criteria; (2) provide extensive teacher training; (3) undertake comprehensive monitoring of special-education plans and programs in local school districts; and (4) file annual reports detailing the monitoring process.

The time frame for implementation of the decree included a one-year planning period to undertake the revisions and a four-year monitoring process that required two site-monitoring visits at each school district in the State. The local monitoring included a review of placement decisions in the designated categories and, where appropriate, a reevaluation of students. Extensive data were collected and analyzed, and comprehensive reports were filed with the court each year. The state officials also consulted with plaintiff parties throughout the term of the decree. During annual status conferences with the court, the parties had an opportunity to discuss the progress under the decree and to address concerns and other pertinent matters. The

11

State addressed concerns through continued review and modification of its programs; with input of the parties, significant progress was made. The decree provided that the State could petition the court for unitary status after completion of the planning and monitoring time periods.

### D. Motion for Declaration of Unitary Status

On October 27, 2006, the state officials filed a motion for declaration of unitary status and termination of the litigation in the area of special education. The court required publication and notice of the proposed dismissal, scheduled a fairness hearing, and established procedures for members of the plaintiff class as well as the general public to file comments and objections.

After the court approved the notice form, the state officials publicized, for two consecutive weeks in the major newspapers in the State, including two principal African-American weekly papers, notice of (1) the proposed termination of the special-education portion of

the litigation; (2) the date of the fairness hearing; (3)
procedures for class members and interested persons to
file comments and objections with the court; and (4)
contact information for counsel so that questions could
be addressed.  The State also posted the notice online;
its internet website contained additional documents such
as the motion, a summary report concerning progress over
the term of the decree, the form for asserting objections
and comments, and the decree itself.  The same materials
were circulated to all local superintendents in the
State, who were directed to post the materials in every
local school board office and to distribute the materials
to all local principals with a request to make the
materials available at local schools.

An objection opposing dismissal of the case was filed
by the Southern Poverty Law Center, the Alabama
Disabilities Advocacy Program, and Alabama Family Ties,
Inc.  As ordered by the court, the parties filed
responses to the objection.  Just before the fairness
hearing, following discussions between the objectors and

13

the state officials, the objectors sought to withdraw their objection.

On December 19, 2006, the court conducted a fairness hearing.  The objectors clarified why they should be allowed to withdraw their objection.  Dr. Mabrey Whetstone, the Director of Special Education Services for the Alabama State Department of Education, testified for the State regarding implementation of the decree.

The court concludes that the State provided adequate notice of the proposed unitary-status declaration to class members as well as to the community.  Fed. R. Civ. P. 23(e).


## II.  DISCUSSION

### A.  Standards for Termination of a
### School Desegregation Case

The goal of a school desegregation case is to convert as soon as is reasonably possible from a <u>de jure</u> segregated school system to a system without "white" schools or "black" schools, but just schools.  <u>Green v.</u>

14

County School Bd. of New Kent, 391 U.S. 430, 442 (1968).
The success of this effort leads to the goal of
ultimately returning control to the local school board
since "local autonomy of school districts is a vital
national tradition." Freeman v. Pitts, 503 U.S. 467, 490
(1992) (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S.
406, 410 (1977)).  Returning schools to the control of
local authorities "at the earliest practicable date is
essential to restore their true accountability in our
governmental system." Id.  Here, the goal was to return
control of the state-wide special-education process to
state officials.

The ultimate inquiry concerning whether an
educational authority operating under a desegregation
order to dismantle a de jure segregated educational
system should be declared unitary is whether there has
been good-faith compliance with the desegregation decree
and whether the vestiges of prior de jure segregation
have been eliminated to the extent practicable.  NAACP,
Jacksonville Branch v. Duval County Sch., 273 F.3d 960,

15

966 (11th Cir. 2001) (citing <u>Missouri v. Jenkins</u>, 515 U.S. 70, 88 (1995)); <u>see also</u> <u>Manning v. Sch. Bd. of Hillsborough County</u>, 244 F.3d 927, 942 (11th Cir. 2001); <u>Lockett v. Bd. of Educ.</u>, 111 F.3d 839, 843 (11th Cir. 1997).

The state officials here are required to show "full and satisfactory compliance" with the 1964, 1967, and 1968 orders of the three-judge court; that retention of judicial control is not necessary or practicable to achieve compliance; and that the State has demonstrated to the public and to the parents and students of the once disfavored race its good-faith commitment to the whole of these decrees. <u>Lee v. Lee County Bd. of Educ.</u>, 963 F.Supp. 1122, 1130 (M.D. Ala. 1997) (Thompson, J.) (citing <u>Jenkins</u>, 515 U.S. at 89 (citing <u>Freeman</u>, 503 U.S. at 491)). Regardless, "[t]he measure of a desegregation plan is its effectiveness." <u>Davis v. Bd. of Sch. Comm'rs</u>, 402 U.S. 33, 37 (1971).

16

B.   Terms of the 2000 Consent Decree
and Compliance Efforts

The 2000 consent decree was comprehensive in nature and was designed to resolve the state-wide issue of special education.   The parties agreed that the state department of education would implement the specific commitments set forth in the decree to resolve the issue of racial disparity observed in the specified special-education exceptionalities, and then set forth in detail the areas to be addressed and the actions to be undertaken.   The decree provided that the State would develop and implement policies and procedures to reduce the disproportionality as seen in overrepresentation of black students in the disability categories of MR and ED, as well as their underrepresentation in the SLD category and in gifted programs.

1.   Emotional Disturbance, Mental Retardation and Specific Learning Disabilities Program:   The state officials were required to implement a variety of policies and procedures to resolve the issues of racial

17

disparities observed in the identification of students in these special-education exceptionalities. To that end, the decree required the state to implement or change policies and practices and to provide training in the areas of awareness, the pre-referral process, the referral process, evaluation procedures, and eligibility criteria. These changes have resulted in a substantial shift in the numbers of black students identified as eligible for special education in the MR, ED, and SLD categories.

a. <u>Awareness Training</u>: The state officials were required under the decree to take steps to ensure that all teachers, administrators, and evaluators in kindergarten through eighth grade were provided awareness training. This training was designed to inform the educators about the reasons for racial disproportionality in the areas of MR, ED, and SLD, the characteristics of students who actually met the criteria to be deemed eligible under those exceptionalities, and the purpose and significance of placement of a student in special

education.   The state officials developed the awareness training and provided the training according to the decree.   All public school teachers, administrators, and evaluators in kindergarten through eighth grade have been trained.   In addition, the training is now mandatory for new teachers.

      b.   <u>Pre-referral Process</u>: In recognition that many at-risk students could benefit from intervention before being referred for special education, and in an effort to reduce the probability students would be misidentified as eligible for special education, the decree required the state officials to implement a pre-referral process.   The process included providing assistance to at-risk students and mandatory implementation of the Building Based Student Support Team (BBSST) model in every school.   The BBSST is a pre-referral program designed to provide local school-based professionals with the structure to work together to address instructional and behavioral problems of students.   The intent is to solve the instructional and

behavioral issues of students through interventions, thus
obviating any need for a referral to special education.
The Alabama Administrative Code was revised to require
students to be monitored by the BBSST before they could
be referred for special education.

The state officials, pursuant to the decree, also
provided teachers with training in appropriate
instructional and behavioral intervention strategies and
methods, including developing a mentoring program for
teachers to provide them with support and to instruct
them in the best instructional practices and behavioral
interventions. In addition, the state implemented the
Alabama Reading Initiative in order to show teachers how
to achieve high levels of literacy for all of their
students.

c. <u>Referral Process</u>: The decree required the
state officials to provide a more structured process for
referrals to special education, and more detailed
information was required on referral forms to assist in
determining whether a student would be evaluated for

special education.  The team reviewing the referral was required to consider any environmental, cultural, language, and economic concerns to determine if the concerns had a bearing on a student's possible eligibility or the test administered to determine eligibility.  In addition, teachers were trained on the revised referral process, and the state officials monitored the effects of the process as required by the decree.

   d. <u>Evaluation Procedures and Eligibility Criteria</u>: The decree required the state officials to revise the eligibility criteria for MR, ED, and SLD in order to ensure that students were properly placed within those exceptionalities.

  The state officials also undertook a review of certain categories of minority students identified as MR to determine if any such student had been inappropriately placed.  Students who no longer met the criteria for MR were evaluated for possible placement in another exceptionality.  Students who were exited completely from

special education were provided services to facilitate their transition into the general-education program. Based on discussions among the parties during implementation of the decree, the state department of education agreed to monitor students who were exited from special-education programs in the MR category.

The state officials trained educational personnel who performed evaluations on the proper administration and interpretation of various assessment measures. The state officials also ensured that all approved assessment instruments were validated for the population for which they were being used, accurately assessed a student's abilities, and, if alternative tests were used, the tester was provided guidelines and training to ensure proper evaluation.

State officials worked closely with local school districts during implementation of the decree. This cooperation during the monitoring process ensured, to the extent practicable, that the identification of minority

students in the areas of MR, ED, and SLD complied with the Alabama Administrative Code and the decree.

2. <u>Gifted Program</u>: The state officials were required to take steps to address the underrepresentation of black students in the gifted program.  To that end, the decree adopted and incorporated an agreement previously entered into by the state department of education and the U.S. Department of Education's Office for Civil Rights in 1999.  As a result of the implementation of the agreement, African-American representation in gifted programs has more than doubled since implementation began.

3. <u>Oversight, Reporting, and Monitoring</u>: The State, as required by the decree, filed annual reports.  Each report detailed the state officials' efforts and accomplishments in implementing the provisions of the decree during the preceding calender year.  These reports were reviewed and monitored by the plaintiff parties, who advised the state officials of any continued concerns about these efforts.  The State filed annual progress

23

reports with the court for discussion during status conferences held each year.  The reports over the last six years have shown that the decree was implemented in good faith by the state officials.

The changes have resulted in a substantial shift in the numbers of black students identified as eligible for special education in the MR, ED, and SLD categories:

Total Population of Students in Special Education
Based on Child Count 2000, 2001, 2002, 2003, 2004, 2005
By Exceptionality and Race/Ethnicity
(Identified in the Lee v. Macon Special Education Consent Decree)

| | Emotional Disturbance | | Mental Retardation | | Specific Learning Disabilities | | Gifted | |
|---|---|---|---|---|---|---|---|---|
| | African American | White | African American | White | African American | White | African American | White |
| 2000 | 1,959 | 2,851 | 13,368 | 6,704 | 15,106 | 26,232 | 2,870 | 18,076 |
| 2001 | 1,741 | 2,423 | 10,697 | 5,964 | 15,678 | 24,727 | 3,549 | 21,414 |
| 2002 | 1,519 | 2,101 | 9,351 | 5,271 | 16,316 | 23,238 | 4,480 | 24,217 |
| 2003 | 1,194 | 1,807 | 7,807 | 4,692 | 17,332 | 22,261 | 5,164 | 24,809 |
| 2004 | 1,007 | 1,540 | 6,337 | 4,265 | 18,782 | 21,738 | 5,751 | 25,282 |
| 2005 | 867 | 1,297 | 5,328 | 3,968 | 19,465 | 21,007 | 6,030 | 25,881 |

Source: Sixth Annual Report (revised) (doc. no. 286-2), at 1.

This reduction in the disproportionality or ratio of black to white students in the programs identified in the decree demonstrates the success of the State in its efforts to comply with the decree.  The ratio of black to

white students in MR programs from 1999 to 2005 has decreased from 3.24:1 to 2.18:1.  The ratio of black to white students in ED programs from 1999 to 2005 has decreased from 1.14:1 to 1.11:1.  The ratio of black to white students in SLD programs from 1999 to 2005 has increased from 0.96:1 to 1.52:1.

    4.  <u>Future Action</u>:  The state officials have evidenced an understanding that the declaration of unitary status does not relieve the State of Alabama of its responsibility to continue to address racial disproportionality in special education.  To that end, the state officials have demonstrated a commitment to the policies and procedures implemented through the decree, including amendments to the Alabama Administrative Code, as modified from time to time as needs dictate or as law requires.  In addition, the court notes that the federal Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1482, contains provisions designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of

children as children with disabilities, id.
§ 1412(a)(24), and data concerning disproportionality in
special education will be reported to the federal
government, id. § 1418(b).


C.   December 19, 2006 Fairness Hearing

As stated, after the court scheduled a fairness
hearing on the State's motion for a declaration of
unitary status, one objection was received from the
Southern Poverty Law Center, the Alabama Disability
Advocacy Project, and Alabama Family Ties.   At the
direction of the court, the parties filed responses to
the objection.   The state officials, the plaintiffs, and
the United States all argued that the objection should
not be sustained.

On the day before the fairness hearing, the objectors
filed notice that they intended to withdraw their
objections.   The objectors stated that this decision was
based on the response filed by the state officials as
well as an agreement the objectors reached during

26

subsequent discussions with the state officials.  Because of the seriousness of the allegations, the court requested that the objectors appear at the fairness hearing to discuss the contents of the objection and to assure the court that there was a basis for their withdrawal of the objections.

At the hearing, counsel for the objectors reiterated in some detail the underlying concerns that were the bases of the objection and their subsequent discussions with the state officials.  Because of the State's cooperation, the objectors did not believe that there was any longer a need for court supervision over the objections.

The objection did not allege that the state officials had failed to comply with the decree, which was designed to reduce disproportionality in specified special-education categories.  Instead, the objection alleged that the reduction in the number of students in special education, particularly in the category of ED, was so dramatic that it suggested that the State had achieved

27

racial proportionality "in direct violation of federal law by failing to properly identify, classify, and provide services to thousands of disabled students--including those children most at risk for dropping out of school and ending up in the criminal justice system."

First, the objectors pointed out that, during the term of the consent decree, the number of students classified as ED dropped steeply. According to the objectors, Alabama had become the State with the second-lowest ED-identification rate in the nation. The objectors submitted an expert report by Daniel J. Losen, who stated that this decline could have resulted from the failure to properly identify children with ED who are entering school, the inappropriate decertification of children with ED, or the transfer of children from the ED category to another disability category.

Second, the objectors noted data showing an increase in suspension rates--particularly for black males--between 2000 and 2003, and a decrease in the graduation rates of black students--both disabled and non-disabled--

from 2000 to 2004.  According to the objectors, these data suggest that, despite the positive outcome of compliance with the decree regarding racial disproportionality, the attempt to achieve compliance may have resulted in disturbing side effects for disabled and minority students.

The objectors expressed concern regarding a correlation between the decrease in the number of students classified as ED and the changes in suspension rates and graduation rates.  The objectors noted that students with ED are generally among the most at-risk schoolchildren in terms of failing classes, retention at the end of the school year, and dropping out of school.

The objectors' concerns were addressed in the written responses filed by the parties and in testimony at the fairness hearing.  In their written responses, the parties argued that the objection was based in large part on a misunderstanding of the limited scope of the decree. According to the parties, the allegations contained in the objection appear to have been extrapolated from the

29

data reported for the three disability categories covered by the decree (MR, ED and SLD), without regard to (or information about) students served in disability areas outside of the decree.

At the fairness hearing, the court heard testimony from Dr. Mabrey Whetstone, Director of Special Education for the State of Alabama Department of Education, who was directly responsible for implementation of the decree. Counsel for the objectors had an opportunity to cross-examine Dr. Whetstone.  According to Dr. Whetstone, the drop in numbers of students identified and served as MR and ED did not mean that students who were eligible for special education are not being served; rather, as a result of more thorough evaluation, they are either now served in a different exceptionality category not covered by the decree or were exited from special education. According to Dr. Whetstone, students who were removed from special education altogether were returned to general education with support from the intervention services made mandatory by the decree.

30

In response to the objectors' concern about graduation rates, the State noted that in absolute numbers, more black and disabled students were graduating in 2005 than in 2000, despite higher graduation standards.  As for dropout rates, the State argued that the standards for classifying students as dropouts had changed over the course of the decree.

Regarding the objectors' concerns about the increasing rate of suspensions and expulsions of students with disabilities, Dr. Whetstone acknowledged in his testimony that he found this trend "alarming."  Fairness Hr'g Tr. at 58.  He stated that the State will begin focusing on this issue and is willing to work with the objectors to develop a strategy for reversing this trend.

Because the explanations provided by the State were based largely on recent data to which the objectors did not have access, the objectors asked to withdraw their objection.  According to the objectors, the State also committed to provide them additional data and to work with them in addressing their concerns about suspension

31

and expulsion rates of students with disabilities.  The
objectors also wish to reserve the right to pursue their
concerns in future litigation, and  the State does "agree
generally" that granting unitary status in this
litigation would not necessarily bar the objectors from
raising their concerns independently.  Fairness Hr'g Tr.
at 14.

Based on the representations made in open court at
the fairness hearing, the court will allow the withdrawal
of the objection and will not address the objection on
its merits.  The objectors' concerns being no longer
before the court, the evidence at the fairness hearing
reflects that the State achieved the stated aims of the
decree and has reduced the disproportionality observed in
the overrepresentation of black students in the special-
education categories of MR and ED and underrepresentation
in SLD and in gifted programs.  This success was achieved
through the initiatives undertaken under the decree,
including the enactment of statutory provisions and
changes in policies and practices.

## III.  CONCLUSION

As stated, the court will allow the withdrawal of the objection filed by the Southern Poverty Law Center, the Alabama Disabilities Advocacy Program, and Alabama Family Ties, Inc.  Therefore, nothing in this opinion should be taken to reflect that the representations of the objectors are true or untrue, nor should the court's recitation of the objectors' concerns be considered a blemish on the noble effort the parties undertook with the 2000 consent decree or on the commendable goal they achieved with its successful implementation.  Rather, because this is a class-action case, the court is under an independent obligation to determine whether unitary status is warranted in the area of special education, <u>see</u> Fed. R. Civ. P. 23(e), and, in the process of making that independent determination, carefully consider whether the withdrawal of arguably relevant evidence as part of the court's deliberation should be allowed.

Based on the annual reports filed by the state officials, discussions in status conferences, and the

33

testimony of Dr. Mabrey Whetstone, this court finds that the state officials have commendably met the standards entitling them to a declaration of unitary status and termination of this litigation in the area of special education.    The State has fully and satisfactorily complied with the orders of this court.  The vestiges of the prior de jure segregated school system in this area have been eliminated to the extent practicable.  The court also finds that the state officials, through their compliance with the court's orders over the years, through their good-faith implementation of their contractual obligations under the 2000 consent decree, and through their adoption of specific policies and actions demonstrating their continuing commitment to the operation of a state school system in compliance with the Constitution in the area of special education, have demonstrated a good-faith commitment to the whole of the court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.  The implementation

of the consent decree appears to have resulted in the appropriate placement of black students in special education and has reduced disproportionality which was the stated goal of this case.

The plaintiff parties have succeeded in the task they began decades ago to seek the end of the seemingly immovable de jure system of school segregation.  This lawsuit sought to bring the State into compliance with the constitutional requirement of equal protection under the law between the black and white races with respect to special education, and the court states today that they have succeeded.  NAACP, Jacksonville Branch v. Duval County Sch., 273 F.3d 960, 976 (11th Cir. 2001).  By its actions today, the court recognizes and congratulates the sustained efforts of all the parties.

Therefore, with the judgment the court will enter today, control over the state-wide issue of special education is properly returned to the Alabama State Board of Education and its members, the State Superintendent of Education, and the Governor of Alabama.  The motion for

35

declaration of unitary status and termination of this litigation filed by the state officials will be granted, all outstanding orders and injunctions will be dissolved, and this litigation dismissed as to the state defendants in the area of special education.  However, the state officials are not dismissed from and remain a party to this litigation as to the state-wide issue of 'facilities,' and the orders dealing with the state-wide facilities issues are not dissolved.

DONE, this the 8th day of March, 2007.


_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE